**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.      1:20-CV-01977-PAB-KMT

DELBERT SGAGGIO,
Plaintiff,

v.

MILES DE YOUNG,
CITY OF WOODLAND PARK,
CITY OF WOODLAND PARK EMPLOYEE JOHN DOE,
JOHN DOES 1-99

Defendants.

---

**DEFENDANTS DE YOUNG AND CITY'S MOTION FOR SUMMARY JUDGMENT**

---

These Defendants, Miles De Young ("Chief De Young") and City of Woodland Park ("City"), by and through their attorneys at Nathan Dumm & Mayer P.C., appearing separately from the other Defendants who have never been specifically identified nor served, hereby submit their Motion for Summary Judgment, with support as follows:

**CONFERRAL**

The undersigned has conferred with Plaintiff regarding this Motion and has been advised that Plaintiff objects.

**INTRODUCTION**

Plaintiff asserts four constitutional claims against the City and Chief De Young. Plaintiff, upset about the lawful execution of a search warrant for which he was in no way involved, made unfounded, indecent, and obscene posts on the Woodland Park Police Department's ("Police Department") and City's respective Facebook pages. Chief De Young temporarily hid Plaintiff's

posts on the Police Department's Facebook page because Plaintiff violated policies associated with that page. Plaintiff's post on the City's Facebook page was also believed to be temporarily hidden, although no current City employee is aware of any such action. These Defendants' actions regarding Plaintiff's Facebook posts do not rise to constitutional violations under the First and Fourteenth Amendments. Furthermore, Chief De Young is entitled to qualified immunity on all claims because either there were no constitutional violations or the law was not clearly established at the time of the actions such that Chief De Young's conduct was known to have violated the First and Fourteenth Amendments. Thus, these Defendants are entitled to summary judgment in their favor on all four of Plaintiff's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

**Plaintiff's Indecent and Obscene Facebook Posts**

1. The Court approved and signed a warrant for the Police Department to search a residence, which was in no way affiliated with Plaintiff, for the unlawful possession of marijuana, thus making the search lawful. [Ex. A, Chief Depo 80:11-24, 126:2-8; Ex. B, De Young Dec. ¶2; Ex. C, Warrant].

2. On or about July 19, 2018, the Police Department posted about the execution of this search warrant on its Facebook page ("Police's Post"). [ECF 1, Compl. p. 7].

3. Anyone on Facebook may read Facebook posts on the City and Police Department's Facebook pages, as well as comments posted by others. [Ex. B, ¶4; Ex. A, 89:5-14].

---

[1] For purposes of this Motion only, to avoid any dispute over material facts, these Defendants accept factual allegations, as opposed to conclusory statements, of which Plaintiff has personal knowledge, as true.

4. The intended audience of the Police Department and City's Facebook pages are the community, including minors. [Ex. B, ¶¶3-4].

5. Chief De Young has personal knowledge of minors reading and/or commenting on the Police Department's Facebook page and reviewing the City's Facebook page. [Ex. B, ¶ 5].

6. On July 19, 2018, a Facebook user entirely separate from the City, posted a video onto Facebook with the caption "Dad tells a story of the house being raided for MMJ" (Woodland Park Video") about the execution of the search warrant. [ECF 1. p. 3].

7. On or about July 20, 2018, Plaintiff apparently watched the Woodland Park Video on Facebook. [*Id.*].

8. In response to the Police Post, Plaintiff made the following posts on the Police Department's Facebook page:

   a. He posted the link to the Woodland Park Video and stated "You target sick kids to get your overtime pay.. [sic] That's why you are a **pig**."

   b. He posted "Why did you **punk ass pigs** remove my post. This is a pubic [sic] forum. I'm going to sue the chief of police, the city of Woodland Park, and whatever **punk ass bitch** remove my post. Your actions are unconstitutional and violation of federal law 18 usc 241,242.. [sic] see you **pigs** in Federal court.."

   c. He posted the link to the Woodland Park Video and stated "You target sick children to Enrich [sic] officers [yellow police officer emoji] with overtime pay.. [sic] **dirty ass** cops."

   d. He stated "Tyler Pope they violate the constitution daily. All too stupid to understand the oath they took. We the people will bring these **terrorists** into federal court."

[Ex. D, Plf Depo Ex. 12, pp. 1-2 (emphasis added); Ex. E, Plf Depo 106:3-6, 198:13-16].

9. Plaintiff's accusation that the police were targeting sick kids was in reference to the execution of the court approved search warrant. [Ex. E, 143:4-9].

10. On or around the same time as these posts, Plaintiff posted to the City's Facebook page the Woodland Park Video and stated "[a]sk the city how they treat sick kids." [ECF 1, p. 20; Ex. E, 113:19-23].

**Plaintiff's indecent and obscene language violated social media policies in effect.**

11. Plaintiff's language was found to be obscene. [Ex. A, 106:14 – 107:1].

12. The use of obscenity violated the Police Department's published social media policy. [Ex. A, 89:22 – 90:12, 91:17-23, 98:9-15].

13. Chief De Young temporarily hid Plaintiff's posts from public view because their use of obscenity violated the Police Department's social media policy. [Ex. A, 89:22 – 90:12, 91:17-23, 98:9-15].

14. The hiding of Plaintiff's posts ultimately led to an inability for him to post on the Police Department's Facebook page for a period of time. [Ex. E, 196:24 – 197:3].

15. As of July 30, 2020, Plaintiff was able to post on at least the Police Department's Facebook page. [Ex. E, 196:24 – 197:3].

16. Since July 30, 2020, Plaintiff did not attempt to re-post his removed posts on the Police Department's Facebook page, although he had the ability to do so if he wanted. [Ex. E, 197:7-12].

17. Plaintiff's post in response to the City's Post contained words that were filtered in accordance with the Page Moderation Policy. [Ex. F, Plf Depo Ex. 13, p. 1].

18. This post was apparently removed from the City's Facebook page. [ECF 1, p. 21].

19. Prior to February 3, 2021, Plaintiff was able to post on the City's Facebook page. [Ex. E, 107:24 - 108:3].

20. Following the removal of his posts from the Police Department's and City's Facebook pages, Plaintiff did not attempt to republish the posts on any other Facebook page, although he had the option to do so. [Ex. E, 92:21-25, 93:19 - 94:1].

21. Plaintiff also chose not to post or re-post his responses to the Police's Post and City's Post onto Youtube, Instagram, or Parler, although he had the option and ability to do so. [Ex. E, 131:24 - 132:3, 133:3-9, 180:10-16].

**Others' critical Facebook posts were not restricted because they did not use indecent and obscene language.**

22. Plaintiff alleges other people made critical Facebook posts about the Police Department and the City, which were not removed from Facebook, including Kristopher Kaiser and Sherise Nipper. [Ex. G, Plf Rog Answer, ¶ 4]].

23. In response to the Police's Post, Mr. Kaiser replied "[w]hat was the probable cause that they had in excess of their allowed 12 plants? What judge signed that warrant?" [ECF 1, p. 28].

24. In response to the Police's Post, Ms. Nipper replied "[a]s a human being, this should make you feel terrible. A man made law is causing epilepsy patients to continue to have horrific seizures, even though we know cannabis heals seizures. The moment the humans in the police department decide this is inhumane will be the moment that we can . . . ." [*Id.* at 27].

25. Nipper's and Kaiser's posts did not contain any obscenities. [ECF 1, pp. 27-28; Ex. E, 164:22 - 165:1, 165:18-21].

26. Nipper's and Kaiser's posts also do not indicate their race or national origin. [Ex. E, 163:1-5; ECF 1, pp. 27-28].

27. Plaintiff speculated that Nipper and Kaiser are white, but had no actual knowledge of such. [Ex. E, 162:1 – 163:5].

28. Nipper's and Kaiser's posts were not removed. [Plf Rog Answer, ¶ 4].

29. Plaintiff indicates he is an Asian man. [Ex. E, 74:22-23].

30. Plaintiff's posts did not indicate his race or ethnic origin. [Ex. E, 75:13-24, 105:13-17, 113:14-18; Ex. D, pp. 1-2].

31. Also, at the time of the posts, Plaintiff's Facebook avatar was David and Goliath and thus did not show a picture of him. [Ex. E, 105:6-10].

32. At the time of the posts, Chief De Young was not aware of Plaintiff's race or ethnic origin. [Ex. E, 74:15-18].

33. Plaintiff is not aware of any comments about his race or national origin being made before Chief De Young hid his post. [Ex. E, 75:4-9].

**Plaintiff is not a journalist and his posts were not journalism.**

34. Plaintiff's current employment includes: running a construction research and design company, operating the Sinsemillas House of Worship, and running an educational non-profit Absolute Natural Rights. [Ex. E, 46:6-14, 47:19-25, 53:4-25].   He does not earn income from this employment. [Ex. E, 46:6-14, 47:19-25, 55:16-20].

35. Plaintiff receives income from the sale of marijuana dispensaries that he owned. [Ex. E, 48:1-4, 51:1-11].

36. Plaintiff does not have any degrees or professional certification or licensure related to journalism. [Ex. E, 14:18 – 16:7].

37. Plaintiff has never received compensation as a journalist and he did not sustain any monetary loss as a result of the posts' removal. [Ex. E, 58:5-14; Ex. G, Plf RFA Answer, ¶ 7].

38. Plaintiff was not present at the execution of the warrant and has no personal knowledge about the proper expertise as to search warrants. [Ex. E, 107:12-15, 143:10-16].

39. Before the postings at issue, Plaintiff did not have a copy of the search warrant or affidavit. [Ex. E, 107:16-18].

40. Before the postings at issue, Plaintiff did not have payroll records or overtime records indicting the officers executing the warrant were being paid overtime. [Ex. E, 140:2-6].

41. Before the postings at issue, Plaintiff did not have any documents indicating that the City knew that a sick child was present at the house searched. [Ex. E, 141: 6-12, 142:16-18].

42. Before the postings at issue, Plaintiff did not contact anyone at the Police Department, the City, or the family involved in the raid. [Ex. E, 89:5-11].

43. At the time of the posts at issue, Plaintiff's Facebook account was not public. [Ex. E, 18:20-23, 59:20 - 25].

44. The actions by these Defendants have not hindered Plaintiff's First Amendment activity as evidenced by three separate recently filed lawsuits asserting similar issues and activity by Plaintiff.  [See 21-cv-00830; 21-cv-00893; 21-cv-00894].

## STANDARD OF REVIEW

Rule 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(a). The nonmoving party bears the burden to establish genuine disputes of material facts. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) (quotation omitted). "Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment." *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir. 1986).

## LEGAL ARGUMENT

**A. Plaintiff has failed to allege a *prima facie* claim of violation of his First Amendment right to free speech.**

The First Amendment protects an individual from government censorship for certain kinds of speech in certain forum. U.S. Const. Am. I. Government regulation of speech may be based upon either the content or the subject matter of the speech. *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013). Viewpoint based regulation is a subset of content-based regulation. *Id.* Viewpoint discrimination is shown when "the defendant acted with a viewpoint-discriminatory purpose" and the defendant acted in order to discriminate on the basis of plaintiff's viewpoint. *Id.* at 1230. Content-neutral regulation, on the other hand, is "[a] regulation that serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)(citation omitted). Content-based regulation is subject to strict scrutiny, while content-neutral regulation is subject to intermediate scrutiny. *Pahls*, 718 F.3d at 1229. The Tenth Circuit has held that a three-minute time limit to speak at a city council meeting satisfied strict scrutiny because it served a significant government interest, was narrowly tailored, and left open ample alternative channels of communication. *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

First Amendment jurisprudence on the regulation of obscenity, however, does not fit neatly within content-based and content-neutral regulation. Obscenity is one of a few categories of speech that is per se afforded less protection under the First Amendment, especially when it is accessible by children. *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 684 (1986). This is so because "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." *Roth v. United States*, 354 U.S. 476, 484 (1957).

The Supreme Court's opinion in *R.A.V. v. St. Paul*, 505 U.S. 377 (1992) explains the lower level of protection afforded to obscenity. Justice Scalia, writing for the majority, explained that "[f]rom 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Id.* at 382-83 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). Obscenity is one of those few limited areas whose restriction is subject to a limited categorical approach. *R.A.V.*, 505 U.S. at 383 (citing *Miller v. California*, 413 U.S. 15, 37 (1973)). Proscription of obscenity as content discrimination is different than content discrimination of non-obscene language because it often does not threaten censorship of certain ideas or viewpoints. *R.A.V.*, 505 U.S. at 387-88. "When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *Id.* at 388.

The restrictions on Plaintiff's speech in this case do not run afoul of the First Amendment. He alleges that his freedom of speech was infringed because of the actions Chief De Young and someone allegedly at the City took restricting his ability to post on certain

Facebook pages after he used indecent and obscene language. Plaintiff used the words "pig," "terrorist," "ass," and "bitch" to refer to the police, and he baselessly and inaccurately accused the police of targeting sick children for personal profit. The evidence indicates there were policies in place prohibiting the use of indecent and obscene language and that Plaintiff's speech violated such policies. There is no genuine dispute of material fact that two other individuals who also responded on the Police Department's page with criticism of the warrant's execution that were articulated with non-obscene language and, thus, not in violation of policy and did not have their posts removed. Thus, the evidence clearly establishes that the restrictions occurred solely because of Plaintiff's indecent and obscenity language, not because Chief De Young or the City were trying to censor Plaintiff's posts about the warrant.

If Plaintiff's speech is subject strict scrutiny because it is based on the content of Plaintiff's speech (which was indecent and obscene), it satisfies this scrutiny. If, in the alternative and to the extent the restricted speech was obscene, its restriction was constitutional per se.

### i.   Restriction of Plaintiff's indecent and obscene speech satisfies strict scrutiny.

Restriction of Plaintiff's speech because of his posts in response satisfies strict scrutiny. First, this restriction served a compelling government interest. The Facebook pages contain stories that are of interest to their community. The intended audience of these posts is the community, including children. Anyone on Facebook may read these pages and the comments thereon, including children. As such, the Police Department and the City had a compelling interest in regulating and preventing anyone from using indecent and/or obscene language visible to the community, including children. *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126

(1989) (holding there is a compelling interest to protect children from obscenity and "from the influence of literature that is not obscene by adult standards").

The narrowly tailored nature of the restrictions can be seen in their enforcement. Plaintiff's posts containing obscene and indecent language were restricted. Other posts expressing the same viewpoint of Plaintiff that did not contain offensive and indecent language were not restricted. Thus, the restrictions did not target viewpoints with which the government may disagree and were narrowly tailored to ferret out only obscene and indecent language.

Finally, these restrictions left open a myriad of other communication channels in which Plaintiff could express his criticism of the police. Not only could he have posted on his own Facebook page and other nonCity/Department operated Facebook page, he could have communicated on any number of ever expanding social media platforms. Plaintiff himself testified that he has social media accounts on Youtube, Instagram, and Parler, but failed to use them. Further, Plaintiff could have voiced his criticism via traditional media or pamphleting.

### ii. Restriction of Plaintiff's obscene speech is constitutional because it is obscene.

In the alternative, the restrictions of Plaintiff's speech are constitutional because they restricted obscenity. As discussed above, obscenity may be proscribed because it is obscene or obscene when it comes to the sensibility of a child. Plaintiff's use of the words "ass" and "bitch" and calling the police "pigs" and "terrorists" for their unsupported and unfounded targeting of sick children were considered obscene and indecent under the social media policies in place and as generally understood in polite civil discourse. As such, they are exempted from First Amendment protections. Further, such exemption does not implicate other protected First

Amendment speech as evidenced by the fact that other critical Facebook posts not containing obscenity were not restricted. Thus, there was no violation of Plaintiff's right to free speech.

**B. Plaintiff has failed to allege a *prima facie* claim of violation of his First Amendment right to freedom of the press.**

The press is afforded protection from government suppression under the First Amendment. U.S. Const. 1st Am. This protection was adopted "to preclude the national government, and by the Fourteenth Amendment to preclude the states, from adopting any form of previous restraint upon printed publications, or their circulation." *Grosjean v. American Press Co.*, 297 U.S. 233, 249 (1936). As used in the First Amendment, the word "press" included "independent printers who circulated small newspapers or published writers' pamphlets for a fee." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 360 (citations omitted).

Here, the dispositive legal question is the threshold question. Is Plaintiff a member of the press such that he is entitled to protection as such under the First Amendment? The answer clearly is no. The undisputed facts show that Plaintiff did not make the Facebook posts in question as a member of the press. Plaintiff's initial post on the Police Department's Facebook page criticized the search warrant's execution because the officers were allegedly "target[ing] to get [their] overtime pay" and reposted a video posted by another Facebook user. His successive posts state a similar opinion along with obscenity and threats about his posts being removed. Likewise, his only post on the City's website repeated some of the same inaccurate statements. These posts are not journalism and Plaintiff is not a journalist for posting them.

Plaintiff made these posts via his own private Facebook account. He did not perform any type of research that a journalist would perform and the posts do not reflect an editorial process. He was not present at the execution of the search warrant. He did not contact any persons or

organizations involved in the execution of the search warrant. He does not know what the proper execution of a search warrant is. He did not have a copy of the search warrant or affidavit used in this instance. He did not have any records indicating that the officers executing the search warrant were entitled to overtime pay. He likewise did not know whether the officers knew there was a sick child at the home. He also did not choose to comment on the search warrant's execution on a different Facebook page or via any other media in which he had accounts, *i.e.*, publish in other media. Further, he is not an unbiased observer. He has been aiding the family in their own lawsuit and he has earned money from the sale of marijuana.

Plaintiff's lack of journalistic experience and expertise is also reflected in his employment background. He runs a construction research and design company, the Sinsemillas House of Worship, and a non-profit organization. He, however, only earns income from dispensaries. He has never received compensation for journalism and has not sustained any monetary lost because of the posts. Moreover, he does not have any degrees or professional certification or licensure related to journalism.

Thus, to call Plaintiff a member of the press merely because he commented, without any personal knowledge, research or editorial process, about law enforcement on Facebook would render the majority of Americans—no matter their age, experience, and comment—into members of the press. Such a conclusion would nullify the meaning of the word "press" and the constitutional protection afforded to it. Plaintiff, therefore, has failed to establish as a matter of law that he is entitled to such protection, and summary judgment should be granted in these Defendants' favor on this claim.

**C.  Plaintiff has failed to allege a *prima facie* claim of violation of his Fourteenth Amendment right to equal protection under the law.**

"The Equal Protection Clause of the Fourteenth Amendment mandates that no state 'deny any person within its jurisdiction the equal protection of the laws.'" *Ramirez v. Dep't of Corrections*, 222 F.3d 1238, 1243 (10th Cir. 2000) (citing U.S. Const. amend. XIV). Discrimination based on race and national origin violates equal protection. *Id.* (citation omitted). A violation occurs when the defendants are shown to have been motivated by racial animus. *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989) (citation omitted). Thus, for instance, the Tenth Circuit affirmed a finding that the defendants denied the Hispanic plaintiffs equal protection under the law because the plaintiffs were treated differently than similarly situated non-Hispanics. *Ramirez*, 222 F.3d at 1243.

Plaintiff's equal protection claim in this case is legally deficient because there is no evidence that he was treated differently than similarly situated persons who are not of Asian descent.  The undisputed facts show that Plaintiff's use of indecent and obscene language caused his posts to be hidden and his ability to post on the City and Police Department's pages limited for a time. There is no indication that his status as an Asian man played any part in this. His posts to the Police Department's and City's pages did not indicate his race or ethnic origin and his Facebook avatar was David and Goliath, not a picture of himself or anything that relates to his race or national origin. Plaintiff is also not aware of any comments about his race being made beforehand, and Chief De Young was not aware of Plaintiff's race or national origin.

Plaintiff's two proffered examples of allegedly white commenters who did not receive similar treatment to him are inapposite. There is no evidence establishing that Sherise Nipper and Kristopher are white. Their posts do not indicate their race or national original. Plaintiff

speculated that there were white based on their surnames and Facebook pages, but does not have any personal knowledge or evidence that there are indeed white. The one salient distinction between their posts and Plaintiff's is his use of indecent and obscene language.

Further, Plaintiff has not established any racial animus. Chief De Young, not knowing Plaintiff was Asian, addressed the posts on the Police Department page solely because they contained indecent and obscene language. Plaintiff was treated similarly by the City. There also is no evidence establishing that the City's actions were linked to race, let alone racial animus. Thus, Chief De Young and the City lack the requisite racial animus.

Because there is no evidence establishing that Plaintiff was treated differently than non-Asian individuals or his race or national origin even known, his claim for equal protection must fail as a matter of law.

### D. Plaintiff has failed to allege a *prima facie* claim for retaliation under the First Amendment.

The government may not retaliate against an individual for exercising his First Amendment rights. *Shero*, 510 F.3d at 1203. The elements of a retaliation claim are as follows: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Id.* The Court's inquiry into the requisite chilling effect is objective. *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004) (citation omitted). The requisite chilling effect is not established by a trivial or de minimis injury. *Shero*, 510 F.3d at 1204 (citing *Eaton*, 389 F.3d at 954-55). Thus, the Tenth Circuit has found that a plaintiff's speech was not chilled because "the City's denial of his

requests for council packets and the mayor's implementation of a time limitation on his speech are, at best, de minimis injuries" and the plaintiff remained free to publicly criticize the city council. *Shero*, 510 F.3d at 1204.

Plaintiff in this case has not alleged a legally sufficient First Amendment retaliation claim. First, as discussed in subsection A above, Plaintiff has not alleged as a matter of law violation of his First Amendment right to free speech. Thus, he has failed to allege that he was engaged in a constitutionally protected activity. Without such, his retaliation claim must fail.

Second, Plaintiff has failed to allege the requisite chilling effect. There is no evidence that Plaintiff stopped or even abated from voicing his criticism of the police because of the restrictions on his speech. There is no evidence that he sustained monetary damages as a result of these restrictions. Instead, Plaintiff has continued to use various social media and remains free to express his criticism there and elsewhere.

Plaintiff not only has not been "chilled" from exercising his right to free speech, but he has continued to engage in this exact type of online provocation at issue in this case and then sued the government official(s) who removed his offensive and/or obscene Facebook posts: (1) 1:21-cv-893-PAB-KMT *Sgaggio v. Douglas County Sheriff Tony Spurlock et al.* in which Plaintiff alleged that on or around March 27, 2019, his Facebook posts alleging police misconduct including murder were removed from the Douglas County Sherriff's page, (2) 1:21-cv-894-PAB-KMT *Sgaggio v. Julie Gonzales et al.* in which Plaintiff alleged that on or around April 25, 2019, Senator Gonzales removed his Facebook post containing a picture of her with the caption "I AM A GUN GRABBING BITCH WHO LOVES TO PISS ON THE CONSTITUTION AND THE PEOPLE OF COLORADO," and (3) 1:21-cv-830-KMT *Sgaggio*

*v. Weiser et al.* in which Plaintiff alleged that the Attorney General removed from his Facebook page multiple obscene posts of Plaintiff including a post stating "Treasonous lil bitch," and a post containing a picture of the Attorney General with statements "THIS LITTLE BITCH LOOKS LIKE HE'S LYING" and "FUCK YOUR RIGHTS."

Furthermore, Plaintiff's ability to continue such online, and often obscene, provocation illustrates that being temporarily restricted from only posting on the Police Department's and the City's Facebook pages constituted at most trivial and de minimis injuries to his First Amendment right to free speech.

Thus, Defendants are entitled to summary judgment in their favor on this claim.

### E. Chief De Young is entitled to qualified immunity on all claims.

A police officer is entitled to qualified immunity if his conduct did not violate clearly established law at the time. *A.M. ex rel. F.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016) (citations omitted). The plaintiff bears the "heavy two-part burden" in rebutting immunity. *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877-78 (10th Cir. 2014). A constitutional right is clearly established if a reasonable officer would understand that his conduct violated that right at the time of the conduct at issue. *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013). "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as [she] maintains." *Holmes*, 830 F.3d at 1135 (citations omitted). The precedent demonstrating that the law is clearly established "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 742 (2011)). In other words, the precedent must clearly establish the law so much so that it is "beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Chief De Young is entitled to qualified immunity on all of Plaintiff's claims under both prongs. First, as discussed at length in the preceding subsections, Plaintiff has failed to sufficiently allege violations of First Amendment and Fourteenth Amendment rights. Chief De Young, therefore, is entitled to qualified immunity under this prong and the analysis ends there.

However, if the Court finds that Chief De Young did violate one of Plaintiff's constitutional rights, such a violation was not clearly established in July 2018, the time at which Plaintiff's speech was restricted.[2] Defense counsel are not aware of any 2018 or earlier Supreme Court or Tenth Circuit precedent clearly establishing that Chief De Young's conduct violated Plaintiff's First Amendment rights. As discussed in subsection A above, the Supreme Court treats obscenity differently, especially obscenity that may be viewed by children. Further, the now common usage of social media has been outpaced by its consideration in the Courts. Thus, unsurprisingly, there is no clear precedent or weight authority on whether enforcing a social media policy regarding obscenity for a governmental entity's Facebook page in July 2018 violated the First Amendment.

In the Supreme Court's 2017 opinion in *Packingham*, the Court stated that "[t]his case is one of the first this Court has taken to address the relationship between the First Amendment and the modern Internet." 137 S.Ct. at 1732. The *Packingham* Court held that North Carolina's law

---

[2] Chief De Young is entitled to qualified immunity as to the Fourteenth Amendment claim because there was no constitutional violation alleged. Due to page limit concerns, Defendants note that they reserve their right to argue that Chief De Young's particular conduct at issue here—enforcing a social media policy banning obscenity on the Police Department's Facebook page—was not also clearly established at the time of his conduct.

prohibiting registered sexual offenders from accessing commercial social networking websites violated the First Amendment because of its wholesale prohibition on use of these sites. *Id.* at 1737-38. The Court noted that a more specific law narrowly tailored to prevent a sex offender from using a site to contact or learn about a minor would be permissible under the First Amendment. *Id.* at 1737. The Court's holding in *Packingham*, however, does not clearly establish the particular conduct in this case violated the First Amendment because the Police Department's social media policy and Chief De Young's enforcement of it targeted the specific use of obscene and indecent language. Plaintiff was not restricted by Defendants from using Facebook to express his criticism or to speak in general.

Defense counsel are aware of one Tenth Circuit case discussing *Packingham*, *Hunt v. Bd. of Regents*, 792 Fed. Appx. 595, 604 (10th Cir. 2019). In this 2019 opinion, the Tenth Circuit held that it was not clearly established that a university violated a medical student's First Amendment right by enforcing its social media policy banning unprofessional conduct in response to the student's expletive-filled Facebook post stating people who support Democratic candidates are worse than Nazis. 792 Fed. Appx. at 601-04. While this conduct does not mirror the conduct at issue in this case, it is closer than the conduct in *Packingham*. Thus, this opinion either does not clearly establish that Chief De Young conduct violated the First Amendment or it shows that the law was even unsettled about Chief De Young's conduct the year after the events at issue. Further, there is no clear weight of authority in the other circuits from the time of the events clearly establishing Chief De Young's conduct violated the First Amendment.

Qualified immunity is therefore appropriate under this prong as well.

## CONCLUSION

These Defendants are entitled to summary judgment in their favor on all four constitutional claims asserted against them. Plaintiff's First Amendment claims fail as a matter of law because Defendants properly restricted the obscene and indecent speech of Plaintiff. His Fourteenth Amendment claim fails as a matter of law because race and national origin are irrelevant to the obscene and indecent speech at issue here and the evidence belies any knowledge or involvement of such in the action. Finally, on all of these claims, Chief De Young is entitled to qualified immunity because there were no constitutional violations and, even if there were, they were not clearly established at the time.

Respectfully submitted this 28th day of May, 2021.

<em>s/Marni Nathan Kloster</em><br>
Marni Nathan Kloster<br>
Nicholas C. Poppe<br>
NATHAN DUMM &amp; MAYER P.C.<br>
7900 E. Union Avenue, Suite 600<br>
Denver, CO  80237-2776<br>
Phone Number: (303) 691-3737<br>
Fax: (303) 757-5106<br>
<em>Attorneys for Miles De Young and City of Woodland Park</em>

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of May, 2021, I electronically filed the foregoing **DEFENDANTS MILES DE YOUNG AND CITY OF WOODLAND PARK'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system. A copy was also sent via email and US mail to the following:

Delbert Sgaggio
1850 North Academy Boulevard
Colorado Springs, CO 80909
719-351-0801
Overclock420@hotmail.com

*s/Alexandra Sanchez*
Paralegal