IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20–cv–01977–PAB–KMT

DELBERT SGAGGIO,

     Plaintiff,

v.

MILES DE YOUNG,
CITY OF WOODLAND PARK,
CITY OF WOODLAND PARK EMPLOYEE JONN DOE, and
JOHN DOES 1–99,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

This case comes before the court on "Defendants De Young and City's Motion for Summary Judgment" (Doc. No. 18 [Mot.], filed May 28, 2021), to which Plaintiff responded in opposition (Doc. No. 20 [Resp.], filed June 16, 2021), and Defendants replied (Doc. No. 22 [Reply], filed June 29, 2021).

### STATEMENT OF CASE

Plaintiff asserts four constitutional claims against the Defendants City of Woodland Park ("City") and Chief Miles De Young related to Plaintiff's posts allegedly removed from the Woodland Park Police Department's ("Police Department") and City's respective Facebook pages. (*See generally,* Doc. No. 1 [Compl.], filed July 7, 2020.)

## STATEMENT OF UNDISPUTED FACTS

1.      The Court approved and signed a warrant for the Police Department to search a residence, which was in no way affiliated with Plaintiff, for the unlawful possession of marijuana, thus making the search lawful.  (Mot., Ex. A, De Young Depo 80:11–24, 126:2–8; Ex. B, De Young Decl. ¶ 2; Ex. C, Warrant.)

2.      On or about July 19, 2018, the Police Department posted about the execution of this search warrant on its Facebook page ("Police's Post").  (Compl. at 7.)

3.       Anyone on Facebook may read Facebook posts on the City and Police Department's Facebook pages, as well as comments posted by others.  (Ex. B, ¶ 4; Ex. A, 89:5–14.)

4.      The intended audience of the Police Department and City's Facebook pages are the community, including minors.  (Ex. B, ¶¶ 3–4.)

5.      Defendant De Young has personal knowledge of minors reading and/or commenting on the Police Department's Facebook page and reviewing the City's Facebook page.  (Ex. B, ¶ 5.)

6.      On July 19, 2018, a Facebook user entirely separate from the City, posted a video onto Facebook with the caption "Dad tells a story of the house being raided for MMJ" ("Woodland Park Video") about the execution of the search warrant.  (Compl. at 3.)

7.      On or about July 20, 2018, Plaintiff apparently watched the Woodland Park Video on Facebook.  (*Id.*)

8.      In response to the Police Post, Plaintiff made the following posts on the Police Department's Facebook page:

> a.      He posted the link to the Woodland Park Video and stated, "You target sick kids to get your overtime pay.. [sic] That's why you are a pig."

> b.      He posted ,"Why did you punk ass pigs remove my post.  This is a pubic [sic] forum. I'm going to sue the chief of police, the city of Woodland Park, and whatever punk ass bitch remove my post.  Your actions are unconstitutional and violation of federal law 18 usc 241,242.. [sic] see you pigs in Federal court.."

> c.      He posted the link to the Woodland Park Video and stated, "You target sick children to Enrich [sic] officers [yellow police officer emoji] with overtime pay.. [sic] dirty ass cops."

> d.      He stated, "Tyler Pope they violate the constitution daily.  All too stupid to understand the oath they took.  We the people will bring these terrorists into federal court." (Ex. D, Pl. Dep. Ex. 12 at 1–2; Ex. E, Pl. Dep. at 106:3–6, 198:13–16.)

9.      Plaintiff's accusation that the police were targeting sick kids was in reference to the execution of the court approved search warrant.  (Ex. E, 143:4–9.)

10.     On or around the same time as these posts, Plaintiff posted to the City's Facebook page the Woodland Park Video and stated, "Ask the city how they treat sick kids."  (Compl. at 20; Ex. E, 113:19–23.)

11.     The use of obscenity violated the Police Department's published social media policy.  (Ex. A, 89:22 – 90:12, 91:17–23, 98:9–15.)

12.     Defendant De Young temporarily hid Plaintiff's posts from public view because their use of obscenity violated the Police Department's social media policy.  (Ex. A, 89:22 – 90:12, 91:17–23, 98:9–15.)

13.   The hiding of Plaintiff's posts ultimately led to an inability for him to post on the Police Department's Facebook page for a period of time.  (Ex. E, 196:24 – 197:3.)

14.   As of July 30, 2020, Plaintiff was able to post on at least the Police Department's Facebook page.  (Ex. E, 196:24 – 197:3.)

15.   Since July 30, 2020, Plaintiff did not attempt to re-post his removed posts on the Police Department's Facebook page, although he had the ability to do so if he wanted.  (Ex. E, 197:7–12.)

16.   Plaintiff's post in response to the City's Post contained words that were filtered in accordance with the Page Moderation Policy.  (Ex. F, Pl. Dep. Ex. 13 at 1.)

17.   Plaintiff alleges this post was removed from the City's Facebook page.  (Compl. at 21.)

18.   Prior to February 3, 2021, Plaintiff was able to post on the City's Facebook page. (Ex. E, 107:24 – 108:3.)

19.   Following the removal of his posts from the Police Department's and City's Facebook pages, Plaintiff did not attempt to republish the posts on any other Facebook page, although he had the option to do so.  (Ex. E, 92:21–25, 93:19 – 94:1.)

20.   Plaintiff also chose not to post or re-post his responses to the Police's Post and City's Post onto Youtube, Instagram, or Parler, although he had the option and ability to do so. (Ex. E, 131:24 – 132:3, 133:3–9, 180:10–16.)

21.   Plaintiff alleges other people made critical Facebook posts about the Police Department and the City, which were not removed from Facebook, including Kristopher Kaiser and Sherise Nipper.  (Ex. G, Pl. Interrog. Answer, ¶ 4.)

22.     In response to the Police's Post, Mr. Kaiser replied, "Wat was the probable cause that they had in excess of their allowed 12 plants?  What judge signed that warrant?"  (Compl. at 28.)

23.     In response to the Police's Post, Ms. Nipper replied, "As a human being, this should make you feel terrible.  A man made law is causing epilepsy patients to continue to have horrific seizures, even though we know cannabis heals seizures.  The moment the humans in the police department decide this is inhumane will be the moment that we can . . . ."  (*Id.* at 27.)

24.     Nipper's and Kaiser's posts did not contain any obscenities.  (*Id.* at 27–28; Ex. E, 164:22 – 165:1, 165:18–21.)

25.     Nipper's and Kaiser's posts also do not indicate their race or national origin.  (Ex. E, 163:1–5; Compl. at 27–28.)

26.     Plaintiff speculated that Nipper and Kaiser are white, but had no actual knowledge of such.  (Ex. E, 162:1 – 163:5.)

27.     Nipper's and Kaiser's posts were not removed.  [Pl. Interrog. Answer, ¶ 4.)

28.     Plaintiff indicates he is an Asian man.  (Ex. E, 74:22–23.)

29.     Plaintiff's posts did not indicate his race or ethnic origin.  (Ex. E, 75:13–24, 105:13–17, 113:14–18; Ex. D at 1–2.)

30.     Also, at the time of the posts, Plaintiff's Facebook avatar was David and Goliath and thus did not show a picture of him.  (Ex. E, 105:6–10.)

31.     At the time of the posts, Defendant De Young was not aware of Plaintiff's race or ethnic origin.  (Ex. E, 74:15–18.)

32.     Plaintiff is not aware of any comments about his race or national origin being made before Defendant De Young hid his post.  (Ex. E, 75:4–9.)

33.     Plaintiff's current employment includes, running a construction research and design company, operating the Sinsemillas House of Worship, and running an educational nonprofit, Absolute Natural Rights.  (Ex. E, 46:6–14, 47:19–25, 53:4–25.)  He does not earn income from this employment.  (Ex. E, 46:6–14, 47:19–25, 55:16–20.)

34.     Plaintiff receives income from the sale of marijuana dispensaries that he owned.  (Ex. E, 48:1–4, 51:1–11.)

35.     Plaintiff does not have any degrees or professional certification or licensure related to journalism.  (Ex. E, 14:18 – 16:7.)

36.     Plaintiff has never received compensation as a journalist, and he did not sustain any monetary loss as a result of the posts' removal.  (Ex. E, 58:5–14; Ex. G, Pl. Request for Admis. Answer, ¶ 7.)

37.     Plaintiff was not present at the execution of the warrant and has no personal knowledge about the proper expertise as to search warrants.  (Ex. E, 107:12–15, 143:10–16.)

38.     Before the postings at issue, Plaintiff did not have a copy of the search warrant or affidavit.  (Ex. E, 107:16–18.)

39.     Before the postings at issue, Plaintiff did not have payroll records or overtime records indicting the officers executing the warrant were being paid overtime.  (Ex. E, 140:2–6.)

40.     Before the postings at issue, Plaintiff did not have any documents indicating that the City knew that a sick child was present at the house searched.  (Ex. E, 141: 6–12, 142:16–18.)

41.     Before the postings at issue, Plaintiff did not contact anyone at the Police
Department, the City, or the family involved in the raid.  (Ex. E, 89:5–11.)

42.     At the time of the posts at issue, Plaintiff's Facebook account was not public.
(Ex. E, 18:20–23, 59:20 – 25.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The moving party bears the initial burden of showing an absence of evidence to support
the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the
moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a
genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*,
36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party
may not rest solely on the allegations in the pleadings, but must instead designate "specific facts
showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P.
56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper
disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)
(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the
evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.
*Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*,
477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible
evidence.  *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The

factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

### A.   *First Amendment Free Speech Claims*

The First Amendment protects an individual from government censorship for certain kinds of speech in certain forum. U.S. Const. Am. I. Government regulation of speech may be based upon either the content or the subject matter of the speech. *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013). Viewpoint-based regulation is a subset of content-based regulation. Id. Viewpoint discrimination is shown when "the defendant acted with a viewpoint-discriminatory purpose" and the defendant acted in order to discriminate on the basis of plaintiff's viewpoint. *Id.* at 1230. Content-neutral regulation, on the other hand, is "[a] regulation that serves purposes unrelated to the content of expression . . . even if it has an

incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation omitted).  Content-based regulation is subject to strict scrutiny, while content-neutral regulation is subject to intermediate scrutiny.  *Pahls*, 718 F.3d at 1229.  The Tenth Circuit has held that a three-minute time limit to speak at a city council meeting satisfied strict scrutiny because it served a significant government interest, was narrowly tailored, and left open ample alternative channels of communication.  *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

Obscenity is one of a few categories of speech that is per se afforded less protection under the First Amendment, especially when it is accessible by children.  *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 684 (1986).  This is so because "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance."  *Roth v. United States*, 354 U.S. 476, 484 (1957).

The Supreme Court's opinion in *R.A.V. v. St. Paul*, 505 U.S. 377 (1992) explains the lower level of protection afforded to obscenity.  Justice Scalia, writing for the majority, explained that "[f]rom 1791 to the present, [ ] our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' "  *Id.* at 382–83 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).  Obscenity is one of those few limited areas whose restriction is subject to a limited categorical approach.  *R.A.V.*, 505 U.S. at 383 (citing *Miller v. California*, 413 U.S. 15, 37 (1973)).  Proscription of obscenity as content discrimination is different than content discrimination of non-obscene language because it often does not threaten

censorship of certain ideas or viewpoints. *R.A.V.*, 505 U.S. at 387–88. "When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *Id.* at 388.

The restrictions on Plaintiff's speech in this case do not run afoul of the First Amendment. He alleges that his freedom of speech was infringed because of the actions Defendant De Young and someone allegedly at the City took restricting his ability to post on certain Facebook pages after he used indecent and obscene language. Plaintiff used the words "pig," "terrorist," "ass," and "bitch" to refer to the police, and he baselessly and inaccurately accused the police of targeting sick children for personal profit. The evidence indicates there were policies in place prohibiting the use of indecent and obscene language and that Plaintiff's speech violated such policies. There is no genuine dispute of material fact that two other individuals who also responded on the Police Department's page with criticism of the warrant's execution that were articulated with non-obscene language and, thus, not in violation of policy and did not have their posts removed. Thus, the evidence clearly establishes that the restrictions occurred solely because of Plaintiff's indecent and obscenity language, not because Defendant De Young or the City were trying to censor Plaintiff's posts about the warrant.

### 1. *Strict Scrutiny*

Restriction of Plaintiff's speech because of his posts in response satisfies strict scrutiny. First, this restriction served a compelling government interest. The Facebook pages contain stories that are of interest to their community. The intended audience of these posts is the community, including children. Anyone on Facebook may read these pages and the comments thereon, including children. As such, the Police Department and the City had a compelling

interest in regulating and preventing anyone from using indecent and/or obscene language visible to the community, including children. *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (holding there is a compelling interest to protect children from obscenity and "from the influence of literature that is not obscene by adult standards").

The narrowly tailored nature of the restrictions can be seen in their enforcement. Plaintiff's posts containing obscene and indecent language were restricted. Other posts expressing the same viewpoint of Plaintiff that did not contain offensive and indecent language were not restricted. Thus, the restrictions did not target viewpoints with which the government may disagree and were narrowly tailored to ferret out only obscene and indecent language. Finally, these restrictions left open a myriad of other communication channels in which Plaintiff could express his criticism of the police. Not only could he have posted on his own Facebook page and other nonCity/Department operated Facebook page, he could have communicated on any number of ever expanding social media platforms. Plaintiff testified that he has social media accounts on Youtube, Instagram, and Parler, but failed to use them. Further, Plaintiff could have voiced his criticism via traditional media or pamphleting.

If, in the alternative and to the extent the restricted speech was obscene, its restriction was constitutional per se.

## 2.   *Restriction of Obscene Speech*

The restrictions of Plaintiff's speech are constitutional because they restricted obscenity. As discussed above, obscenity may be proscribed because it is obscene or obscene when it comes to the sensibility of a child. Plaintiff's use of the words "ass" and "bitch" and calling the police "pigs" and "terrorists" for their alleged targeting of sick children were considered obscene and

indecent under the social media policies in place and as generally understood in polite civil discourse.

Plaintiff's argument that these words are not obscene or indecent (Resp. at 6–7) goes against common sense.  "Punk ass bitch" is not a literary turn of phrase.  (Id. at 7.)  Moreover, it is inaccurate to refer to the police as "terrorists" (*id.*), when there is no dispute that the execution of the search warrant was lawful.  (Undisputed Facts, ¶ 1.)

Moreover, Plaintiff cites legal authority that no longer applies or is not analogous to the facts of this case.  As set forth above, the Court's review of protections afforded to obscenity in *R.A.V. v. St. Paul*, which distinguishes past Supreme Court jurisprudence on obscenity, including the *Miller v. California* decision cited by Plaintiff.  *R.A.V.*, 505 U.S. at 383.  In *Cohen v. California*, the U.S. Supreme Court held that California could not criminalize wearing a jacket with the words "Fuck the Draft" on it in a courthouse.  403 U.S. 15, 26 (1971).  The fleeting nature of this speech, its use in a traditional public forum, and exposure to criminal penalty are not analogous with Plaintiff's posting of obscenity on a public Facebook page and its temporary removal from the page.  Likewise, Plaintiff's other proffered legal authority concerns the imposition of criminal penalty for speech directed at police in person.  (See Resp. at 5–6 [citing *Houston v. Hill*, 482 U.S. 451 (1987); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974); *Terminiello v. Chicago*, 337 U.S. 1(1949)].)  Here, Plaintiff was not subject to any criminal penalty other than the temporary removal of his speech.

Plaintiff's obscene speech is exempted from First Amendment protections.  Further, such exemption does not implicate other protected First Amendment speech as evidenced by the fact

that other critical Facebook posts not containing obscenity were not restricted.  Thus, there was no violation of Plaintiff's right to free speech.

Defendants are entitled to summary judgment on Plaintiff's First Amendment free speech claim.

**B.     *First Amendment Freedom of Press Claim***

The press is afforded protection from government suppression under the First Amendment.  U.S. Const. 1st Am.  This protection was adopted "to preclude the national government, and by the Fourteenth Amendment to preclude the states, from adopting any form of previous restraint upon printed publications, or their circulation."  *Grosjean v. American Press Co.*, 297 U.S. 233, 249 (1936).  As used in the First Amendment, the word "press" included "independent printers who circulated small newspapers or published writers' pamphlets for a fee."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 360 (1995) (citations omitted).

Defendants argue that Plaintiff is not a member of the press such that he is entitled to protection under the First Amendment.  (Mot. at 12–13.)  The undisputed facts show that Plaintiff did not make the Facebook posts in question as a member of the press.  Plaintiff's initial post on the Police Department's Facebook page criticized the search warrant's execution because the officers were allegedly "target[ing] to get [their] overtime pay" and reposted a video posted by another Facebook user.  His successive posts state a similar opinions along with obscenity and threats about his posts being removed.  Likewise, Plaintiff's only post on the City's website repeated some of the same inaccurate statements.

Plaintiff's posts are not journalism, and Plaintiff is not a journalist for posting them. Plaintiff made these posts via his own private Facebook account.  He did not perform any type of

research that a journalist would perform and the posts do not reflect an editorial process.  He was not present at the execution of the search warrant.  He did not contact any persons or organizations involved in the execution of the search warrant.  He does not know what the proper execution of a search warrant is.  He did not have a copy of the search warrant or affidavit used in this instance.  He did not have any records indicating that the officers executing the search warrant were entitled to overtime pay.  He did not know whether the officers knew there was a sick child at the home.  He also did not choose to comment on the search warrant's execution on a different Facebook page or via any other media in which he had accounts.

Plaintiff's lack of journalistic experience and expertise is also reflected in his employment background.  He runs a construction research and design company, the Sinsemillas House of Worship, and a non-profit organization.  Plaintiff only earns income from dispensaries. He has never received compensation for journalism and has not sustained any monetary lost because of the posts.  Moreover, he does not have any degrees or professional certification or licensure related to journalism.

Plaintiff cannot call himself a member of the press merely because he commented, without any personal knowledge, research or editorial process, about law enforcement on Facebook.  Such a conclusion would nullify the meaning of the word "press" and the constitutional protection afforded to it.

Plaintiff, therefore, has failed to establish that he is entitled to such First Amendment free press protection, and summary judgment should be granted in the defendants' favor on this claim.

### C.    *Equal Protection Claim*

"The Equal Protection Clause of the Fourteenth Amendment mandates that no state 'deny any person within its jurisdiction the equal protection of the laws.' " *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1243 (10th Cir. 2000) (citing U.S. Const. amend. XIV).  Discrimination based on race and national origin violates equal protection.  *Id.* (citation omitted).  A violation occurs when the defendants are shown to have been motivated by racial animus.  *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989) (citation omitted).

Plaintiff's equal protection claim in this case is legally deficient because there is no evidence that he was treated differently than similarly situated persons who are not of Asian descent.  There is no evidence that Plaintiff's status as an Asian man played any part in his posts being hidden or on his ability to post on the City and Police Department's pages limited for a time.  His posts to the Police Department's and City's pages did not indicate his race or ethnic origin, and his Facebook avatar was David and Goliath, not a picture of himself or anything that relates to his race or national origin.  Plaintiff is also not aware of any comments about his race being made beforehand, and Defendant De Young was not aware of Plaintiff's race or national origin.

Because there is no evidence establishing that Plaintiff was treated differently because of his race or national origin, his equal protection fails, and Defendants are entitled to summary judgment on the claim.

### D.    *First Amendment Retaliation Claim*

The government may not retaliate against an individual for exercising his First Amendment rights.  *Shero*, 510 F.3d at 1203.  The elements of a retaliation claim are "(1) that

the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Id.* The Court's inquiry into the requisite chilling effect is objective. *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004) (citation omitted). The requisite chilling effect is not established by a trivial or de minimis injury. *Shero*, 510 F.3d at 1204 (citing *Eaton*, 389 F.3d at 954–55). Thus, the Tenth Circuit has found that a plaintiff's speech was not chilled because "the City's denial of his requests for council packets and the mayor's implementation of a time limitation on his speech are, at best, de minimis injuries," and the plaintiff remained free to publicly criticize the city council. *Shero*, 510 F.3d at 1204.

Plaintiff has not alleged a legally sufficient First Amendment retaliation claim. First, as discussed above, Plaintiff's First Amendment free speech claim fails. Thus, he has failed to show that he was engaged in a constitutionally protected activity. Without such, his retaliation claim must fail.

Second, Plaintiff has failed to allege the requisite chilling effect for a retaliation claim. There is no evidence that Plaintiff stopped or even abated from voicing his criticism of the police because of the restrictions on his speech. There is no evidence that Plaintiff sustained monetary damages as a result of these restrictions. Instead, Plaintiff has continued to use various social media and remains free to express his criticism there and elsewhere.

Plaintiff not only has not been "chilled" from exercising his right to free speech, but he has continued to engage in this exact type of online provocation at issue in this case and then

sued the government officials who removed his offensive and/or obscene Facebook posts. (*See* 21–cv–893–PAB–KMT, *Sgaggio v. Douglas County Sheriff Tony Spurlock*, *et al.* in which Plaintiff alleged that on or around March 27, 2019, his Facebook posts alleging police misconduct including murder were removed from the Douglas County Sheriff's page' 21–cv– 894–PAB–KMT, *Sgaggio v. Julie Gonzales, et al.*, in which Plaintiff alleged that on or around April 25, 2019, Senator Gonzales removed his Facebook post containing a picture of her with the caption "I AM A GUN GRABBING BITCH WHO LOVES TO PISS ON THE CONSTITUTION AND THE PEOPLE OF COLORADO"; and 21–cv–830–PAB–KMT, *Sgaggio v. Weiser, et al.*, in which Plaintiff alleged that the Attorney General removed from his Facebook pages multiple obscene posts of Plaintiff including a post stating "Treasonous lil bitch," and a post containing a picture of the Attorney General with statements "THIS LITTLE BITCH LOOKS LIKE HE'S LYING" and "FUCK YOUR RIGHTS.")

Furthermore, Plaintiff's ability to continue such online posts illustrates that being temporarily restricted from only posting on the Police Department's and the City's Facebook pages constituted, at most, trivial and de minimis injuries to Plaintiff's First Amendment right to free speech.

Thus, Defendants are entitled to summary judgment in their favor on Plaintiff's retaliation claim.

### E.   *Qualified Immunity*

Defendant De Young argues he is entitled to qualified immunity on any individual capacity claims asserted against him. (Mot. at 2–11.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  The court has discretion to address the "clearly established" element before addressing whether a constitutional violation actually occurred.  *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Once the defendant raises a qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time.  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000).  "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas*, 765 F.3d at 1194 (internal quotation marks omitted).

Because the court has recommended that the defendants be granted summary judgment on all of the claims against them, Defendant De Young should be granted qualified immunity on the claims.

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that "on "Defendants De Young and City's Motion for Summary Judgment" (Doc. No. 18) be **GRANTED**.

### ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal

conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for de novo review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar de novo review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation de novo despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116,

1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).

Dated this 31st day of January, 2022.

BY THE COURT:

_____

Kathleen M. Tafoya
United States Magistrate Judge